## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 11 2017, 9:11 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Adam C. James
Shelbyville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Julie Jean Wright, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | December 11, 2017 <br><br> Court of Appeals Case No. <br> 73A04-1702-CR-256 <br><br> Appeal from the Shelby Circuit Court. <br><br> The Honorable Charles D. O'Connor, Judge. <br><br> Trial Court Cause No. <br> 73C01-1407-F2-1 |

**Darden, Senior Judge**

# Statement of the Case

Julie Jean Wright appeals from her convictions of one count of dealing methamphetamine,[1] a Level 2 felony; one count of possession of methamphetamine,[2] a Level 3 felony; and one count of neglect of a dependent,[3] a Level 5 felony. We affirm.

# Issues

Wright presents the following restated issues for our review:

I. Whether there is sufficient evidence to support Wright's convictions; and

II. Whether the trial court committed fundamental error by admitting an exhibit.

# Facts and Procedural History

Narcotics Officer James Jones of the Shelbyville Police Department employed a specific confidential informant for about one year as of July 2014. That informant had assisted police in obtaining approximately ten to twelve convictions. In July 2014, the informant was in contact with drug dealer, Jovina Cueto. Officer Jones learned through communications with an officer

---

[1] Ind. Code § 35-48-4-1.1(e) (2014).

[2] Ind. Code § 35-48-4-6.1(d) (2014).

[3] Ind. Code § 35-46-1-4(b) (2014).

with the Rushville Police Department that Cueto was supplying Shelbyville drug users with methamphetamine.

[4] Following up on this lead, Jones asked the informant if he knew Cueto. Officer Jones learned that the informant had previously purchased drugs from Cueto. The informant then arranged a controlled buy with Cueto for one-half ounce of methamphetamine in exchange for $850.00. However, the controlled purchase was delayed by one day because of rain. Rain makes for poor visibility on video recordings, and audio recordings of the transaction are much more difficult to hear.

[5] The controlled purchase took place on July 15, 2014 at a Pilot Station not far from Exit 109, which is near a casino in Shelby County. Wright, who was eight months pregnant at the time, drove her black, four-door, Oldsmobile to the location of the controlled buy with her fifteen-year-old daughter, who was also pregnant, seated on the front passenger side, and Cueto seated in the back behind Wright. Wright's dog was also present in the back of the vehicle. The two women had a history of Wright providing Cueto with rides in exchange for money.

[6] Just prior to the transaction, Wright drove the three to meet Wright's friend, Corey, near Raymond Street in Indianapolis. According to Officer Jones, Cueto had initially tried to arrange for the transaction to occur in Marion County, but the informant, at the direction of the officers, declined. Corey

fronted the drugs to Wright and Cueto, and expected to receive $750.00 in return after Wright and Cueto each kept $50.00 for their efforts.

[7] Narcotics officers from the Shelbyville Police Department and the Shelbyville Sheriff's Department–Officers Mike Polston, Mike Cleveland, and Joseph Mohr–took part in the controlled buy. Officer Mohr conducted surveillance and watched the delivery between Cueto and the informant. Cueto got out of Wright's vehicle, sat in the passenger side of the informant's vehicle, and sold the informant methamphetamine for $850.00. She and the informant talked about the quality of the methamphetamine, and Cueto said she had been using methamphetamine all night the previous night. She also talked about having a hungry, pregnant friend and that they had to leave. Once the transaction was completed, Cueto exited the informant's car, the informant left, and Wright drove herself, her daughter, and Cueto to a nearby McDonald's restaurant.

[8] As he was leaving, the confidential informant gave the police officers monitoring the transaction a pre-arranged signal to indicate that the transaction was complete. The officers then stopped Wright's car, took the three women into custody, and transported them to the jail for interviews.

[9] Prior to being transported, Wright told Officer Jones that there was a dog in the car and that she wanted him to care for it for her. The officer then reached in the back seat of the car to secure the dog for transport to animal control. When doing so, he observed $800.00 of the buy money on the floorboard where Cueto

had been sitting and approximately $200.00 or more also in that area on the floorboard.

[10] The vehicle was then impounded, a hold was placed on it, and it was stored in a secure site inside the wrecker service's building while officers attempted to obtain a search warrant for the vehicle. After the officers had a K-9 unit walk around the vehicle, the canine alerted to the presence of narcotics coming from the vehicle. Officer Jones presented all of the pertinent information to a judge who issued a search warrant for the vehicle.

[11] Wright was driving the vehicle at the time of the stop and her black purse was found inside the car near the front passenger's seat. Officers discovered a bindle of methamphetamine inside the purse along with credit cards bearing Wright's name. Subsequent lab testing by the Indiana State Police of this substance and the substance sold to the confidential informant confirmed that it was methamphetamine. The amount sold to the informant weighed 13.9 grams. The methamphetamine found in Wright's purse weighed 1.09 grams. When officers searched Cueto, they found her cell phone, and $50.00 of the buy money supplied by the police to the informant for the transaction. No methamphetamine was found on Cueto during that search.

[12] At the police station, officers interviewed Wright and Cueto. Officer Polston, who had outfitted the informant with a body digital recorder and had searched him and the vehicle he was driving before and after the transaction, participated in Wright's two interviews. After Wright's first interview, she was allowed to

talk with her daughter and Detective Mohr arranged for the release of Wright's daughter to Wright's mother, who had guardianship over her. Wright's daughter's pregnancy was characterized as high risk.

[13] Officer Cleveland and Officer Polston both participated in Wright's two interviews.

[14] In the first interview, according to Officer Cleveland, Wright denied knowing anything about a drug transaction and claimed that she was receiving $50.00 in cash for simply giving Cueto a ride.

[15] Officers also questioned Cueto. After that interview, a follow-up interview of Wright was conducted.

[16] During Wright's second interview, she admitted that she had obtained methamphetamine from her friend, Corey. She also admitted that he fronted the women the drugs and expected to receive $750.00 for himself, allowing for Wright and Cueto to each receive $50.00 for their efforts.

[17] The State charged Wright with one count of dealing methamphetamine, a Level 2 felony; one count of possession of methamphetamine, a Level 3 felony; and, one count of neglect of a dependent, a Level 5 felony. The jury found Wright guilty as charged. The trial court sentenced Wright to fifteen years executed, with three years suspended to probation. Wright now appeals.

# Discussion and Decision

## I. Sufficiency of the Evidence

[18] Wright challenges the sufficiency of the evidence supporting her convictions. We note that Wright was charged in the alternative as both a principal and an accomplice. Appellant's App. pp. 26-27. Upon review of a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge witness credibility. *Leonard v. State*, 80 N.E.3d 878, 882 (Ind. 2017). Instead, we consider only the evidence and reasonable inferences supporting the verdict. *Id.* We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

[19] Of course, under an accomplice theory, the State was required to prove beyond a reasonable doubt that Wright knowingly or intentionally aided, induced, or caused another person to commit an offense. Ind. Code § 35-41-2-4 (1977). The statute does not set forth a separate crime, but provides a separate basis of liability for the crime that is charged against the defendant. *Specht v. State*, 838 N.E.2d 1081, 1092 (Ind. Ct. App. 2005), *trans. denied*. As such, a defendant can be charged with the crime as a principal and convicted of the offense as an accomplice. *Id.*

[20] To prove that Wright had committed the criminal offense of dealing in methamphetamine as a Level 2 felony, the State was required to establish beyond a reasonable doubt that Wright knowingly or intentionally delivered

methamphetamine when the amount of the drug was more than ten grams. Ind. Code § 35-48-4-1.1.

[21] To prove that Wright had committed the criminal offense of possession of methamphetamine as a Level 3 felony, the State was required to establish beyond a reasonable doubt that Wright knowingly or intentionally possessed methamphetamine weighing more than ten grams in the physical presence of a child less than eighteen years of age knowing that the child was present and might be able to see or hear the offense. Ind. Code § 35-48-4-6.1.

[22] To prove that Wright committed the criminal offense of neglect of a dependent as a Level 5 felony, the State was required to establish that Wright, who had the care of her daughter either legally or voluntarily, knowingly or intentionally placed her in a situation that may have endangered her life or health while Wright committed the offense of dealing methamphetamine. Ind. Code § 35-46-1-4.

[23] The facts which were presented at trial and support the verdict establish that Cueto contacted Wright by text on July 14, 2014. Cueto referred to Wright as "my girl" and had several contacts with Wright on that date. Tr. p. 182. Phone records also disclosed that Cueto was in contact with the confidential informant at approximately the same time. Cueto contacted the confidential informant through Facebook messaging to arrange for the sale of one half ounce of methamphetamine. Cueto corroborated the price and amount of the

methamphetamine–$850 for one-half ounce–and communicated to Wright that she needed a ride.

[24] According to Cueto's testimony at trial, Wright knew a man named Corey who supplied the methamphetamine to them. Wright, Wright's daughter, and Cueto met Corey in a parking lot. Cueto did not possess any methamphetamine prior to this meeting. Wright drove her daughter and Cueto to the Pilot Station in Shelbyville to make the sale.

[25] Wright's testimony at trial confirmed that she was being paid to drive Cueto to the Pilot Station. Although Wright testified that before she drove to the Pilot Station she met Corey in an attempt to sell her dog, she did confirm that the black purse in the car was hers.

[26] The evidence and reasonable inferences drawn therefrom established that Cueto, who referred to Wright as "my girl," texted Wright and made several phone calls to her on July 14, 2014. At approximately the same time, Cueto was also communicating through Facebook on that date with the confidential informant, who wanted to purchase methamphetamine. More specifically, the informant wanted to purchase a half ounce of methamphetamine and the price was arranged at $850.00.

[27] Wright then drove her pregnant, fifteen-year-old daughter, and her friend, Cueto, to meet Wright's friend, Corey. Wright met with Corey who fronted Wright one-half ounce of methamphetamine, without requesting payment up front. He expected the methamphetamine to be sold for $850.00, with each of

the women keeping $50.00 and Corey receiving $750.00 for the transaction. Wright's fifteen-year-old daughter was also with them when they met the confidential informant at the Pilot Station.

[28] Wright's arguments on appeal–to meet Corey to sell her dog and provide her friend, Cueto, a ride–amount to invitations to reweigh the evidence. Precedent clearly prohibits us from accepting that invitation to allow Wright to take a second bite at the evidentiary apple. The evidence is sufficient to establish each of Wright's convictions.

## II. Fundamental Error

[29] Wright argues that the trial court committed fundamental error in the admission of State's Exhibit 20, which was the forensic scientist's lab report.

[30] We note at the outset that the admission of evidence lies within the sound discretion of the trial court. *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014). Rulings on the admissibility of evidence are reviewed for an abuse of discretion and ordinarily reversed when admission is clearly against the logic and effect of the facts and circumstances. *Thomas v. State*, 81 N.E.3d 621, 624 (Ind. 2017).

[31] Here, Wright failed to object at trial to the admission of the exhibit, and therefore, has waived any claim of error on appeal, unless the error is fundamental. *Taylor v. State*, 687 N.E.2d 606, 609 (Ind. Ct. App. 1997), *trans. denied*. In fact, counsel for Wright explicitly stated that there was no objection to the admission of the exhibit.

[32]     When a fundamental error argument is raised, we review it for fundamental error–an "extremely narrow exception to the waiver rule" where the defendant bears the heavy burden of showing that a fair trial was impossible. *Harris v. State*, 76 N.E.3d 137, 139 (Ind. 2017) (quoting *Gibson v. State*, 51 N.E.3d 204, 212 (Ind. 2016)).

[33]     Wright contends that the trial court committed fundamental error by admitting the exhibit because the weight of the methamphetamine found in Wright's purse and the weight of the methamphetamine sold to the informant were transposed in the report.

[34]     The lab technician, Hailey Newton, testified about the methamphetamine and the report. She explained that she did a preliminary test and then a confirmatory test of both substances and determined that they were methamphetamine. She also identified the bags containing the substances she tested.

[35]     Newton also explained that while the weights listed on the lab report were correct, she had mistakenly placed the tag for Item Number One on Item Number Two and vice versa. State's Exhibit 20, the lab report with the test results, was admitted without objection. The exhibits containing the two amounts of methamphetamine were also admitted without objection. Wright's counsel thoroughly cross-examined Newton about her testing practices and the mistaken labeling of the bags containing the methamphetamine.

[36] We conclude that Wright has not met her burden of establishing that fundamental error occurred as a result of the admission of State's Exhibit 20. The lab technician explained the mistaken labeling, which had no effect on her test results or the weight of the substances. Wright's counsel cross-examined her about mistake. The trial court did not commit fundamental error in admitting the evidence.

## Conclusion

[37] In light of the foregoing, we find that Wright's convictions are affirmed.

[38] Affirmed.

Robb, J., and Brown, J., concur.