## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 04 2019, 8:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

Marco L. Webster
Carlisle, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Marco L. Webster,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

November 4, 2019

Court of Appeals Case No.
19A-PC-189

Appeal from the Marion Superior Court

The Honorable Mark D. Stoner, Judge

Trial Court Cause No.
49G06-1509-PC-34504

**Najam, Judge.**

# Statement of the Case

Marco L. Webster appeals the post-conviction court's denial of his petition for post-conviction relief. Webster raises nine issues for our review, which we consolidate and restate as the following two issues:

1. Whether the trial court abused its discretion when it failed to investigate a conflict between Webster and his trial counsel and when it denied his trial counsel's motion to withdraw his appearance.

2. Whether the post-conviction court clearly erred when it determined that he had not received ineffective assistance from his trial counsel.

We affirm.

# Facts and Procedural History

The facts underlying Webster's robbery convictions were stated by this Court in his direct appeal:

> On New Year's Eve of 2012, around 12:30 p.m., construction worker Randall Crouch (Crouch) had completed a job on the northwest side of Indianapolis, Indiana, and was loading tools into his 2004 Ford Econoline work van. A black male wearing a brown coat, a hoodie, and a mask over his face approached Crouch, pointed a semi-automatic pistol at his face, and ordered him to unlock the van and start the ignition. Crouch complied, and after the robber had driven out of sight, he reported the carjacking to the Indianapolis Metropolitan Police Department (IMPD), describing the van as half blue and half white, with ladders on the roof rack.

Later that day, shortly before 3:00 p.m., a man armed with a semi-automatic handgun walked into the International Parts Store, located at 5360 N. Tacoma Avenue in Indianapolis, and yelled for everyone to get down on the floor. At that time, three employees were in the building: Todd Norris (Norris), Brian Smith (Smith), and Eric Thompson (Thompson). At the gunman's command, Smith removed the cash from the register, and all three gave him the cash from their wallets. After the gunman ran out of the store, Smith called 9-1-1 and reported that the store had been robbed at gunpoint by "a black male wearing a blue and white plaid jacket with a dark hoodie."

Minutes later, a black male "wearing dark pants, . . . a bluish-black plaid jacket with a hoodie on, and with a scarf on his face[,]" entered the Harris Tire & Automotive Service, located across the street from the International Parts Store at 5425 N. Keystone Avenue. The man aimed a semi-automatic handgun at an employee, Danny Stumm (Stumm), and instructed him to empty the cash drawer. As Stumm was unlocking the register, the robber noticed a customer, Kenneth Rush (Rush), and demanded his wallet. When the perpetrator detected movement by another employee, Joshua Scholl (Scholl), he immediately turned and shot Scholl in the hip. Scholl retreated to the garage bays, where the company's owner, William Harris (Harris), was servicing a vehicle. Scholl, in the midst of calling 9-1-1, alerted Harris to the fact that he had been shot. Due to the noise of the compressor, Harris was unaware of the ongoing robbery. When Harris opened the door to the showroom to investigate, the robber fired a second shot in Harris' direction. Although the bullet missed Harris, shrapnel hit him on the side of his face. The gunman exited the store, and Harris and Scholl observed through the window as he entered the driver-side door of a Ford service van, half white and half blue, with ladders on top. Harris noted that the license plate number was 1562534.

Within minutes of the robberies, IMPD officers responded to both locations and commenced investigations. The witnesses were all separated for interviews, and Scholl was transported to the hospital. In general, they described the suspect as a black male in his twenties or thirties and of "average" or "medium" height and build. The witnesses also confirmed that the suspect was wearing a very distinctive blue and white plaid coat, dark pants, a dark hoodie that was pulled over his head, and a dark-colored scarf that left only his eyes exposed. Norris, Thompson, and Stumm described the scarf as having a camouflage pattern. In addition, while ordered to lie on the ground, Norris and Thompson observed that the suspect wore brand new tennis shoes that "were black and what I remember distinctly was the very clean white edges, around the bottom." Thompson identified the brand of shoes as "Jordans" and further noted that the suspect had facial hair "around his nose."

On that same afternoon, IMPD Officer Gary Toms (Officer Toms) was working an off-duty security job at Inverness Apartments, located on the northwest side of Indianapolis, about a fifteen-to-twenty-minute drive from the International Parts Store and the Harris Tire & Automotive Service. At approximately 3:15 p.m., a blue and white Ford Econoline van pulled into the parking lot. When it passed by Officer Toms' squad car, he observed that the driver, later identified as Webster, was the sole occupant of the van. Immediately recognizing the van as the one described in the carjacking reported earlier that day, Officer Toms radioed for assistance. Officer Michael Roach (Officer Roach) was in the area and arrived moments later. They followed the van's route to the rear of the apartment complex and observed Webster walking on the sidewalk, wearing a dark-colored hoodie and carrying a "plaid flannel looking coat or jacket." When they instructed him to stop, Webster took off running.

As the officers pursued him on foot, they saw Webster throw the coat and several other items down. Officer Roach apprehended Webster, placed him in handcuffs, and escorted him to his squad car. Retracing Webster's steps, the officers found a black nine-millimeter handgun and $682 in cash strewn throughout the snow, along with the blue and white plaid jacket. Inside the jacket pocket was a camouflage-patterned scarf and Rush's wallet. The van was registered to Crouch and had the license plate number 1562534.

In the midst of his investigation at the International Parts Store, Detective Brent Hendricks (Detective Hendricks) received a report that Webster had been stopped with a van matching the one described by the Harris Tire & Automotive Service employees. Detective Hendricks told the witnesses that IMPD "had a person stopped that I wanted them to look at. . . . I specifically informed them that it may or may not be the person that robbed them but I did want them to take a look." Between 4:00 p.m. and 5:15 p.m., Norris, Smith, Thompson, Harris, Stumm, and Rush were separately transported to Inverness Apartments in order to identify whether Webster was the robbery suspect.

Because Webster had discarded the plaid coat when he fled, Officer Roach held the coat up near Webster for the first witness and subsequently draped it over Webster's shoulders for the rest. Each of the six witnesses unequivocally identified the jacket as being the same one worn by the robber. In addition to the jacket and hoodie, Harris immediately identified the van as the one used by the robber, and Rush noted that Webster's "build and everything seemed to be the same." Norris also indicated that Webster's "shoes were the dead giveaway." Finally, Thompson stated that he "was a hundred percent positive that the clothes and the shoes were the same. And I could tell from the upper half of [Webster's] face that it was the same facial features as the guy who came and robbed us."

*Webster v. State*, No. 49A02-14-4-CR-253, 2015 WL 849475, at *1-3 (Ind. Ct. App. Feb. 26, 2015) (citations omitted), *trans. denied*.

[4]     The State charged Webster with one count of carjacking, as a Class B felony (Count 1); four counts of criminal confinement, as Class B felonies (Counts 2 through 5); five counts of robbery, as Class B felonies (Counts 6 through 9 and 11); one count of battery, as a Class C felony (Count 10); and one count of unlawful possession of a firearm by a serious violent felon, as a Class B felony (Count 12). Thereafter, the State amended the information and additionally charged Webster with one count of robbery, as a Class A felony (Count 13).[1] The State also alleged that Webster was a habitual offender.

[5]     On February 24 and 25, 2014, the trial court held a bifurcated jury trial. At the conclusion of the trial, the jury found Webster not guilty of Counts 1 and 2, but guilty of Counts 3 through 11 and 13. During the second phase of the trial, the State dismissed Count 12, and Webster stipulated to the habitual offender charge. Based on double jeopardy concerns, the trial court merged Counts 3, 4, and 5 into Counts 6, 7, and 8, and it merged Counts 9 and 10 into Count 13. Accordingly, the trial court entered judgment of conviction on Counts 6, 7, 8, 11, and 13 and adjudicated Webster a habitual offender. The trial court then

---

[1] Counts 6, 7, 8, 9, and 11 alleged that Webster had robbed Smith, Thompson, Norris, Stumm, and Rush, respectively, while armed with a deadly weapon. Count 13 alleged that Webster had robbed Stumm while armed with a deadly weapon and that that robbery resulted in serious bodily injury to Scholl.

sentenced Webster to an aggregate sentence of eighty-five years in the Department of Correction.

[6] On direct appeal, Webster raised two issues for our review. He first asserted that "the trial court abused its discretion in admitting evidence of the show-up identifications." *Webster*, 2015 WL 849475 at *4. Webster also asserted that "the State presented insufficient evidence to support his conviction." *Id*. at *5. We affirmed Webster's convictions.

[7] Thereafter, Webster, *pro se*, filed his amended petition for post-conviction relief. In that petition, Webster raised fifteen claims of ineffective assistance of trial counsel and two claims of ineffective assistance of appellate counsel. He further asserted that the trial court had abused its discretion for three reasons. Following a hearing, the post-conviction court entered findings of fact and conclusions of law. As to Webster's multiple claims of ineffective assistance of counsel, the post-conviction court concluded that Webster had not demonstrated "any error" on the part of his trial counsel. Appellant's App. Vol. II at 27. Similarly, the post-conviction court concluded that "Webster's appellate counsel was not ineffective." *Id*. at 28. And as to Webster's claims that the trial court had abused its discretion, the post-conviction court concluded that those were freestanding issues that Webster could not raise in his petition for post-conviction relief because they were either available to Webster on direct appeal but not raised or raised on appeal and decided against him. Accordingly, the court denied Webster's petition. This appeal ensued.

# Discussion and Decision

[8] Webster appeals the post-conviction court's denial of his petition for post-conviction relief. As our Supreme Court has stated:

> "The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence." *Campbell v. State*, 19 N.E.3d 271, 273-74 (Ind. 2014). "When appealing the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment." *Id*. at 274. In order to prevail on an appeal from the denial of post-conviction relief, a petitioner must show that the evidence leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Weatherford v. State*, 619 N.E.2d 915, 917 (Ind. 1993). Further, the post-conviction court in this case entered findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). Although we do not defer to the post-conviction court's legal conclusions, "[a] post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (internal quotation omitted).

*Humphrey v. State*, 73 N.E.3d 677, 681-82 (Ind. 2017).

[9] In particular, Webster alleges that the trial court abused its discretion when it failed to investigate a conflict between Webster and his trial counsel and when it denied trial counsel's motion to withdraw his appearance. He further asserts that the post-conviction court erred when it determined that he was not denied the effective assistance of trial counsel.

## Issue One:  Abuse of Discretion by Trial Court

[10]   Webster first contends that the trial court abused its discretion when it failed to investigate a conflict between him and his trial counsel and when it denied his trial counsel's motion to withdraw his appearance.[2]  However, "[p]ost-conviction procedures do not afford a petitioner with a super-appeal, and not all issues are available." *Timberlake v. State*, 753 N.E.2d 591, 597 (Ind. 2001).  Rather, "[p]ost-conviction procedures provide defendants the opportunity to raise issues that were not known at the time of the original trial or were not available to defendants on direct appeal." *Bunch v. State*, 778 N.E.2d 1285, 1289 (Ind. 2002).  "It has long been held that claims available on direct appeal but not presented are not available for post-conviction review." *Id.*  Here, both of Webster's claims that the trial court had abused its discretion were known and available to Webster but not raised on direct appeal.  Accordingly, Webster's claims of trial court error are not available for post-conviction review.  The post-conviction court properly denied those freestanding claims of error.

## Issue Two:  Effectiveness of Trial Counsel

[11]   Webster next contends that the post-conviction court clearly erred when it determined that he did not receive ineffective assistance from his trial counsel.  As our Supreme Court has explained:

---

[2]  In his petition for post-conviction relief, Webster also asserted that the trial court abused its discretion when it admitted as evidence testimony that identified clothing worn by the robber.  However, Webster does not raise that issue on appeal.

When evaluating an ineffective assistance of counsel claim, we apply the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed. 2d 674 (1984). *See Helton v. State*, 907 N.E.2d 1020, 1023 (Ind. 2009). To satisfy the first prong, "the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *McCary v. State*, 761 N.E.2d 389, 392 (Ind. 2002) (citing *Strickland*, 466 U.S. at 687-88, 104 S. Ct. 2052). To satisfy the second prong, "the defendant must show prejudice: a reasonable probability (i.e. a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different." *Id*. (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. 2052).

*Campbell v. State*, 19 N.E.3d 271, 274 (Ind. 2014). The "[f]ailure to satisfy either prong will cause the claim to fail." *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002). Further, "[t]here is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Weisheit v. State*, 109 N.E.3d 978, 983 (Ind. 2018). "Counsel is afforded considerable discretion in choosing strategy and tactics and these decisions are entitled to deferential review." *Id.*

[12] On appeal, Webster asserts that his trial counsel was ineffective because his trial counsel: (1) failed to seek a dismissal of all charges against him; (2) failed to seek dismissal of Count 9; (3) failed to request a lesser-included jury instruction; (4) failed to object to the use of a photograph as evidence; (5) failed to object to the State's ballistic evidence; and (6) elicited an in-court identification of Webster. We address each argument in turn.

*1) Motion to Dismiss*

[13]     Webster first contends that his trial counsel was ineffective for failing to file a motion to dismiss all of the charges against him. In order to prevail on a claim of ineffective assistance of counsel due to a failure to file a motion to dismiss, "the defendant must show a reasonable probability that the motion to dismiss would have been granted if made." *Garrett v. State*, 992 N.E.2d 710, 723 (Ind. 2013). Here, Webster specifically contends that his trial counsel was ineffective for failing to file a motion to dismiss all of the charges against him because he was not represented by counsel at the initial hearing. Webster maintains that, had he been represented by counsel at the initial hearing, his attorney at that hearing "could have challenged" several inaccuracies in the probable cause affidavit. Appellant's Br. at 38.

[14]     Webster is correct that a "defendant's right to counsel arises at any point during a criminal proceeding in which the absence of counsel would erode the defendant's right to a fair trial." *Hopper v. State*, 957 N.E.2d 613, 616 (Ind. 2011). This includes any critical stage in which incrimination may occur or where the opportunity for effective defense must be seized or be foregone. *Id*. However, "[a]n initial hearing conducted under Indiana's statutory scheme is not a critical stage of the criminal proceeding requiring the presence of counsel." *Id*. As Webster did not have the right to counsel at his initial hearing, he has not shown that there is a reasonably probability that a motion to dismiss the charges against him based on the lack of representation at that stage would have been granted. Webster has not demonstrated that he received

ineffective assistance from his trial counsel for failing to file a motion to dismiss the charges.  We affirm the post-conviction court's judgment on this issue.

## 2) Multiplicitous Charges

[15] Webster next asserts that his trial counsel was ineffective because he did not seek to have a "multiplicitous indictment" dismissed.  Appellant's Br. at 21.  Again, in order to prevail on this claim, Webster must show a reasonable probability that the motion to dismiss would have been granted if made.  *Garrett*, 992 N.E.2d 723.  Webster's argument on this issue is not clear, but it appears as though he asserts that his trial counsel should have moved to dismiss Count 9, robbery, as a Class B felony, because that count was duplicative of Count 13, robbery, as a Class A felony since both counts were based on the robbery of Stumm.  However, our Supreme Court has held that, "a defendant may be tried in the same proceeding for multiple offenses, including greater and lesser offenses[.]"  *Griffin v. State*, 717 N.E.2d 73, 78.  As Webster could be tried in the same proceeding for both robbery, as a Class A felony, and robbery, as a Class B felony, in the same proceeding, he has not shown that a motion to dismiss the Class B felony robbery charge would have been granted.[3]  Webster's counsel was not ineffective for failing to file a motion to dismiss Count 9, and we affirm the post-conviction court on this issue.

---

[3]  Further, even if we assume for the sake of argument that a reasonable attorney would have filed a motion to dismiss Count 9, Webster has not shown that the result of the proceedings against him would have been different as the trial court did not enter judgment of conviction against Webster on Count 9.

Webster also asserts that the post-conviction court erred when it determined that he did not receive ineffective assistance from his trial counsel based on his counsel's failure to request that the jury be instructed that Count 9, robbery, as a Class B felony, was a lesser included offense to Count 13, robbery, as a Class A felony. To prevail on this claim, Webster has the burden to show that counsel unreasonably failed to request a proper instruction and that Webster was prejudiced by the failure to request the instruction. *See Potter v. State*, 684 N.E.2d 1127, 1134 (Ind. 1997). Further, as our Supreme Court has held:

> When a defendant requests an instruction covering a lesser-included offense, a trial court applies the three-part analysis set forth in *Wright v. State*, 658 N.E.2d 563, 566-67 (Ind. 1995). The first two parts require the trial court to determine whether the offense is either inherently or factually included in the charged offense. If so, the trial court must determine whether there is a serious evidentiary dispute regarding any element that distinguishes the two offenses. *Wright* held that if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense.

*Wilson v. State*, 765 N.E.2d 1265, 1271 (Ind. 2002) (quotation marks and citations omitted).

At the time of the offenses, robbery was defined as a person who knowingly or intentionally takes property from another person or from the presence of another person by using or threatening the use of force or by putting any person

in fear. Ind. Code § 35-42-5-1 (2012). The offense was a Class B felony if it was committed while armed with a deadly weapon. *Id*. And the offense was a Class A felony if it resulted in serious bodily injury to any person other than the defendant. *Id*. On the facts of this case, the State charged Webster with robbery, as a Class B felony, based on the allegation that Webster had robbed Stumm while armed with a deadly weapon. And the State charged Webster with robbery, as a Class A felony, based on the allegation that Webster had robbed Stumm while armed with a deadly weapon and that the robbery resulted in serious bodily injury to Scholl.

[18] Here, the distinguishing element between the two offenses is the serious bodily injury to Scholl. *See Hogan v. State*, 966 N.E.2d 738, 749 (Ind. Ct. App. 2012). Accordingly, the Class B felony robbery charge is factually included in the Class A felony charge, and Webster would therefore have been entitled to a lesser included jury instruction only if there was a serious evidentiary dispute concerning the element of serious bodily injury. *See id*.

[19] However, there was no dispute at Webster's trial that Scholl was shot in the hip and that the person who shot him was the same person who had robbed Stumm. Accordingly, there was no evidentiary dispute regarding the element that distinguishes the two robbery charges. In other words, the jury could have either concluded that Webster had not robbed Stumm and therefore did not shoot Scholl or that Webster had robbed Stumm and shot Scholl. But the jury could not have found that Webster had robbed Stumm but not shot Scholl. As such, the jury could not have concluded that Webster had committed the lesser

offense of robbery while armed with a deadly weapon but not the greater offense of robbery that resulted in serious bodily injury. *See Wilson*, 65 N.E.2d at 1271. Because there is no serious evidentiary dispute regarding any element that distinguished the two offenses, Webster cannot prevail on his claim that his attorney was ineffective for failing to request a lesser included jury instruction. We affirm the post-conviction court's judgment on this issue.

### 4) *Photographic Evidence*

[20] Webster next contends that his trial counsel was ineffective because he did not object to the State's use of a photograph as evidence. To prove ineffective assistance of counsel due to the failure to object, "the petitioner must establish that an objection would have been sustained and that the petitioner was prejudiced by the failure to object." *Ivy v. State*, 98 N.E.3d 107, 111 (Ind. Ct. App. 2018). Webster maintains that his trial counsel should have objected when the State showed a photograph of the Harris Tire & Automotive Service ("Harris Tire") robbery to a witness of the International Parts Store robbery because that photograph was evidence of a prior bad act in violation of Indiana Evidence Rule 404(b).

[21] Indiana Evidence Rule 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But that rule further provides that the evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." Ind. Evidence

Rule 404(b)(2). Here, it is clear that the State used the photograph of the Harris Tire robbery to establish the identity of the person who had robbed the International Parts Store. Accordingly, that evidence was admissible under Indiana Evidence Rule 404(b)(2). And because that evidence was admissible, any objection by his trial counsel would not have been sustained. Webster's trial counsel was not ineffective for failing to object to the State's use of that photograph, and we affirm the post-conviction court on this issue.

### 5) Ballistics Evidence

Webster also contends that he received ineffective assistance from his trial counsel when his trial counsel failed to object to the State's ballistics evidence. Again, to prove that his counsel was ineffective for failing to object to evidence, Webster must demonstrate that the objection would have been sustained and that he was prejudiced by the failure to object. *Ivy*, 98 N.E.3d at 111.

On this issue, Webster first asserts that his trial counsel should have objected to the ballistics evidence that officers had collected because the evidence was "tainted" since an employee had cleaned up the crime scene before officers arrived. Appellant's Br. at 24. However, Webster has not presented any evidence to support his assertion that any employee had cleaned up the crime scene prior to the arrival of officers.[4] Accordingly, Webster has not met his

---

[4] In his brief on appeal, Webster claims that Drew Hall testified in a deposition that he had cleaned up blood off the floor. But Webster did not provide a copy of that deposition to the post-conviction court, nor has he provided a copy of that deposition in the record on appeal.

burden on appeal to demonstrate that the crime scene was compromised or that any evidence was tainted.

[24] Next, Webster asserts that his trial counsel should have objected to the ballistics evidence because the State's expert testified that he had been asked to examine two bullet fragments even though the officers had only collected one fragment from the crime scenes. Webster maintains that his attorney should have objected to that testimony because the second bullet fragment "was never documented anywhere" and because there "was no chain of custody." *Id*. at 34.

[25] But even assuming for the sake of argument that a reasonable attorney would have objected on those grounds, Webster has not shown that he was prejudiced by his attorney's failure to object. While the ballistics expert testified that he had been asked to examine two bullet fragments, the actual evidence admitted at trial only included one bullet fragment. *See* Trial Ex. at 34. Further, when the expert testified about the results of his examination, he only discussed one bullet fragment. And he testified that his findings regarding that fragment were "inconclusive" and that he was unable to determine if that fragment had been fired from the firearm that officers had found near Webster at the time of his arrest. Trial Tr. Vol. II at 204. Because Webster has not demonstrated that he was prejudiced by his trial counsel's failure to object to the ballistics expert's testimony regarding two bullet fragments, Webster's contention that his counsel was ineffective for failing to object must fail. We affirm the post-conviction court on this issue.

### 6) Identification Testimony

Finally, Webster contends that the post-conviction court erred when it concluded that he had not received ineffective assistance from his trial counsel when his trial counsel elicited an in-court identification of Webster. Specifically, Webster asserts that his attorney was ineffective when he asked Smith, a State's witness, whether the person who had robbed him was in the courtroom. Webster contends that that question by his attorney, which his attorney asked despite the fact that the trial court had granted his motion to suppress any in-court identifications of Webster, "jeopardize[d] the defense" by allowing jurors to hear positive identifications that were "tainted by police officers" at the show-up identification. Appellant's Br. at 36, 37.

On this issue, the post-conviction court found that Webster's trial counsel elicited the in-court identification of Webster as a matter of trial strategy. In particular, the post-conviction court found that Webster's trial counsel had made a "tactical decision" to ask Smith to make an in-court identification of Webster, which decision allowed trial counsel to get Smith to "ultimately concede[] that he could not be certain of the identification." Appellant's App. Vol. II at 24. We agree with the post-conviction court.

At Webster's trial, the defense strategy was to challenge the State's evidence that identified Webster as the person who had robbed the stores. Webster's trial counsel asked Smith to identify Webster as a part of that strategy. During the hearing on Webster's petition for post-conviction relief, Webster's trial counsel testified that he had asked Smith to identify Webster in order to demonstrate to

the jury that Smith could only identify Webster "based on the show up[.]" Tr. Vol. II at 28. Indeed, after trial counsel asked Smith to identify Webster, trial counsel further asked Smith if he was "certain." Trial Tr. Vol. II at 2. In response, Smith conceded that he "can't be certain it's the man." *Id*. at 3.

[29] It is apparent that Webster's trial counsel elicited that identification from Smith because counsel wanted the jury to hear that Smith could not positively identify Webster as the person who had robbed him. Those questions are consistent with trial counsel's strategy to challenge the State's allegation that Webster had committed the robberies. Further in support of his trial strategy, Webster's trial counsel also asked Norris if he saw the person who had robbed him in court. In response, Norris stated: "No." *Id*. at 18.

[30] Webster's trial counsel made a strategic decision to elicit an in-court identification of Webster by Smith in order to show the jury that his identification was not definitive and was based only on who he had seen at the show-up identification instead of who he had seen during the robberies. And Webster's trial counsel made a strategic decision to ask Norris if he saw the robber in court in order to show the jury that Norris could not identify Webster as the person who had robbed him. We cannot say that Webster's trial counsel's strategy to elicit an in-court identification from Smith and to attempt to elicit an in-court identification from Norris was "'so deficient or unreasonable as to fall outside the objective standard of reasonableness.'" *State v. Miller*, 771 N.E.2d 1284, 1288 (Ind. Ct. App. 2002) (quoting *Potter v. State*,

684 N.E.2d 1127, 1133 (Ind. 1997)).  We affirm the post-conviction court's judgment on this issue.

## *Conclusion*

In sum, the post-conviction court properly denied Webster's freestanding claims that the trial court had abused its discretion because those claims are not available for post-conviction review.  And the post-conviction court did not clearly err when it determined that Webster had not received ineffective assistance from his trial counsel.  We affirm the post-conviction court's denial of Webster's petition for post-conviction relief.

Affirmed.

Bailey, J., and May, J., concur.